UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    Plaintiff,

  v.             Case No. 20-CR-185

LOUIS REY PEREZ, III,
a/k/a "Ocho," "Eight Ball,"

    Defendant.

---

## PLEA AGREEMENT

---

1.  The United States of America, by its attorneys, Richard G. Frohling, United States Attorney for the Eastern District of Wisconsin, and Elizabeth M. Monfils and Gail J. Hoffman, Assistant United States Attorneys, and the defendant, Louis Rey Perez, III, individually and by attorney Patrick K. Cafferty, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

## CHARGES

2.  The defendant has been charged in four counts of a fifteen-count indictment, which alleges violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(C), and 846; and Title 18, United States Code, Sections 924(c)(1)(A)(i), 1956(a)(1)(B)(i), 1956(h), and 2.

3.  The defendant has read and fully understands the charges contained in the Indictment. He fully understands the nature and elements of the crimes with

which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

<u>*COUNT ONE*</u>
*THE GRAND JURY CHARGES THAT:*

1. *Beginning by at least January 2017, and continuing until on or about September 22, 2020, in the State and Eastern District of Wisconsin and elsewhere,*

*LOUIS REY PEREZ, III,*
*a/k/a "Ocho," a/k/a "Eight Ball,"*
*XINA YANG,*
*JULIAN SANCHEZ,*
*a/k/a "Terps,"*
*MIGUEL SARABIA,*
*a/k/a "Ali Mas," a/k/a "Ali Massari,"*
*GABRIEL MATTESON,*
*LOUIS REY PEREZ, JR.,*
*a/k/a "Pops,"*
*MANUEL SOTO,*
*a/k/a "Roach," a/k/a "Grillo,"*
*ANTONIO RODRIGUEZ,*
*a/k/a "Lil Mexico," a/k/a "Grumpy," a/k/a "Bump,"*
*HAUSENG YANG,*
*HECTOR ARENAS,*
*LUIS F. GOMEZ, JR.,*
*a/k/a "Scarecrow,"*
*IVAN J. GALAN,*
*a/k/a "Porky,"*
*JOSE A. ALVARADO,*
*a/k/a "Jokes,"*
*ESTEBAN REYES,*
*KEVIN TAYLOR,*
*a/k/a "Eskimo,"*
*MA YANG,*
*MARY YANG,*
*JASMINE L. PEREZ,*
*MICHAEL BUB,*
*a/k/a "Buddy,"*
*CHONG YANG,*
*a/k/a "Chongy,"*
*MICHELE M. HART,*

2

**MERCEDES HERBERT GONZALEZ,**
**AZIA YANG,**
**CARINA RODRIGUEZ,**
**GER YANG, and**
**SHAYLA A. KNUEPPEL**

knowingly and intentionally conspired with each other, and with other persons known and unknown to the grand jury, to possess with the intent to distribute and to distribute a mixture and substance containing a detectable amount of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

2.      With respect to defendants LOUIS REY PEREZ, III, a/k/a "Ocho," a/k/a "Eight Ball," and XINA YANG, the amount involved in the conspiracy attributable to each defendant as a result of his and her own conduct, and the conduct of other co-conspirators reasonably foreseeable to him and her, is five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

3.      With respect to defendants JULIAN SANCHEZ, a/k/a "Terps," MIGUEL SARABIA, a/k/a "Ali Mas," a/k/a "Ali Massari," LOUIS REY PEREZ, JR., a/k/a "Pops," MANUEL SOTO, a/k/a "Roach," a/k/a "Grillo," and ANTONIO RODRIGUEZ, a/k/a "Lil Mexico," a/k/a "Grumpy," a/k/a "Bump," the amount involved in the conspiracy attributable to each defendant as a result of his or her own conduct, and the conduct of other co-conspirators reasonably foreseeable to him or her, is 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

4.      With respect to defendants GABRIEL MATTESON, HAUSENG YANG, HECTOR ARENAS, LUIS F. GOMEZ, JR., a/k/a "Scarecrow," IVAN J. GALAN, a/k/a "Porky," JOSE ALVARADO, a/k/a "Jokes," ESTEBAN REYES, KEVIN TAYLOR, a/k/a "Eskimo," MA YANG, MARY YANG, JASMINE L. PEREZ, MICHAEL BUB, a/k/a "Buddy," CHONG YANG, a/k/a "Chongy," MERCEDES HERBERT GONZALEZ, AZIA YANG, CARINA RODRIGUEZ, GER YANG, and SHAYLA A. KNUEPPEL, the amount involved in the conspiracy attributable to each defendant as a result of his or her own conduct, and the conduct of other co-conspirators reasonably foreseeable to him or her, is 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A), (b)(1)(B), and (b)(1)(C), and Title 18, United States Code, Section 2.

## COUNT SIX

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about September 22, 2020, in the State and Eastern District of Wisconsin,

**LOUIS REY PEREZ, III,**
**a/k/a "Ocho," "Eight Ball,"**

3

*knowingly possessed eight firearms in furtherance of the drug trafficking offense charged in Count One of this Indictment, to wit:*

1. *a Glock, model 17, 9 mm pistol, bearing serial number BGLV701;*
2. *a Glock, model 19, 9 mm pistol, bearing serial number BKZM586;*
3. *a Sterling, model 22 LR, .22 caliber pistol, bearing serial number a61300;*
4. *a Ruger, model LC9s, 9 mm pistol, bearing serial number 45108407;*
5. *a Springfield Armory, model Hellcat, 9 mm pistol, bearing serial number At284605;*
6. *a Glock, model 43, 9 mm pistol, bearing serial number ADKR940;*
7. *a Glock, model 22 Gen4, .40 caliber pistol, bearing serial number VMD542; and*
8. *a Crusader, model ST15, .223 caliber rifle, bearing serial number DV032018.*

*All in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).*

5.    The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

## Summary of Investigation

In September 2018, law enforcement authorities identified Louis R. Perez III (a/k/a "Ocho," and a/k/a "Eight Ball"), also identified as a Mexican Posse gang member, as the individual spearheading a drug-trafficking organization (DTO) that was distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin, and elsewhere since at least January 2017. Law enforcement authorities also identified Xina Yang, Perez III's then girlfriend, as someone who worked hand-in-hand with Perez III to further the DTO. The DTO obtained cocaine and marijuana from California, either through couriers or through United Parcel Service (UPS) and FedEx. Perez III and Yang coordinated the package retrieval from various Milwaukee, Wisconsin residences, oversaw a marijuana vape cartridge manufacturing operation located at a codefendant's residence, distributed marijuana and marijuana-related products under the name brand "Midwest Connect" or "Midwest Connected," and mailed drug proceeds to the California-based supplier.

4

Upon further investigation, authorities learned that, beginning in at least January of 2017, Julian Sanchez and/or Miguel Sarabia, Sanchez's father, who resided in California, supplied the Perez III DTO with bulk marijuana, marijuana edibles, marijuana oils/waxes, and marijuana vape cartridges.

During the course of the investigation, Title III orders authorized the interception of communications over seven telephones used by Perez III, Yang, Sanchez, and Sarabia, as well as the Snapchat account "Midwest_connect," used by Perez III. Collectively, these interceptions began on March 20, 2020, and continued through September 22, 2020, with the exception of small periods of time. The intercepted communications confirmed that Perez III obtained marijuana from Sanchez and Sarabia; that Perez III distributed the narcotics to mid-level distributors and suspected street-level users; and that Yang facilitated and coordinated the day-to-day DTO operations.

### DTO's History, Method, and Operation

The investigation revealed that up until late 2019, Perez III and Yang frequently traveled to California on behalf of the DTO, many times staying for significant periods of time in hotels and Airbnb rentals. At this time, Perez III and Yang instructed other DTO members to manage the distribution of controlled substances in Milwaukee when they were in California.

On September 25, 2018, Louis R. Perez Jr., Perez III's father, was stopped in Utah with eight kilograms of cocaine in a trap compartment in his truck. Perez III and Yang drove separately, but traveled along with Perez Jr. from California to Wisconsin, communicating with Perez Jr. on two prepaid telephones activated before their departure from California. After Perez Jr. was stopped, Perez III and Yang also stopped, at which point Yang booked hotel rooms and airfare for herself, Perez III, and Perez Jr. upon his release from custody.

Beginning in November 2019, Perez III and Yang moved back to Milwaukee. At this time, the DTO's mode of operation switched to mailing controlled substances and proceeds between California and Milwaukee. Also at this time, Sanchez obtained hundreds of pounds of marijuana from growers in northern California. Sanchez, along with Gabriel Matteson, packaged and sent the marijuana through FedEx and UPS to numerous addresses in Milwaukee, Wisconsin. Perez III and Yang regularly tracked the controlled substance packages' whereabouts on their phones. They also coordinated the package retrieval from various Milwaukee residences.

Court authorized interceptions, combined with physical surveillance, reflect that the Perez III DTO received at least 200 packages, believed to contain marijuana and THC oil, which have been delivered by FedEx and UPS, to at least eight different addresses. DTO package recipients included Jose Alvarado, Shayla

Knueppel, Mercedes Herbert Gonzalez, Chong Yang, Mary Yang, Ma Yang, and Michael Bub.

On April 29, 2020, law enforcement seized and lawfully searched a DTO package. The package contained approximately 9 pounds of high-grade marijuana and approximately 237 grams of THC oil, which oil was packaged in one-gram quantity plastic containers. Both the THC oil and marijuana were packaged in vacuum sealed bags. Later in the day on April 29, 2020, in accordance with UPS policy, UPS opened another package addressed to Alvarado and Knueppel's address because it smelled of marijuana. The package was found to contain approximately 2,029 grams of THC oil, which was packaged in one-gram quantity plastic containers. Throughout April 29 and 30, 2020, both Perez III and Yang contacted FedEx and UPS numerous times regarding the intercepted packages.

Perez III used couriers, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, and Esteban Reyes to obtain the packages containing controlled substances from various addresses and transport the packages to other DTO locations, including Perez Jr.'s residence, where the packages were stored until manufacture, packaging, and distribution. Hector Arenas maintained at least two stash houses where Perez III and various other DTO members were often seen coming and going around the time of suspected drug transactions. Jasmine Perez, Perez III's sister, served as a DTO nominee, leasing one of the stash apartments that was controlled by Manual Soto.

Additionally, the Perez III DTO manufactured "vape cartridges" containing THC oil at the residence of Mary Yang, Yang's sister. Under the direction of Perez III and Yang, marijuana vape cartridges were assembled by the thousands by DTO members primarily connected to Xina Yang, including Ma Yang, Mary Yang, Chong Yang, Azia Yang, Carina Rodriguez, Ger Yang, Hauseng Yang, and Michael Bub. The investigation also revealed that Sanchez and/or Sarabia also imported supplies, to include vape cartridge tubes and boxes, as confirmed by the seizure and search of five DHL packages, which contained high-end, top rated CUREpen and Rove vape cartridge boxes.

Case agents estimate based on the number of DHL boxes received by the Perez III DTO that the DTO received at least 25,000 vape cartridge boxes and empty marijuana vape pens that were imported from Hong Kong.

Perez III distributed the cocaine, marijuana, and marijuana-related products to mid-level DTO-distributors, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, Hector Arenas, Luis Gomez, Jr., Ivan Galan, Esteban Reyes, Kevin Taylor, and Ger Yang. These mid-level distributors subsequently distributed the controlled substances to numerous customers in the greater Milwaukee, Wisconsin, area, at times using the third-party application Snapchat. The marijuana and marijuana-

6

related products were distributed under the brand name "Midwest Connect" or "Midwest Connected."

Subsequently, the DTO mailed packages containing bulk currency in the form of drug proceeds to Sanchez or enlisted money couriers to transport the drug proceeds to California. Furthermore, on various occasions in 2020, Sarabia traveled to Milwaukee, Wisconsin, to obtain drug proceeds from Perez III.

Yang counted and packaged the drug proceeds that were sent to Sanchez via the United States Postal Service (USPS) at three different addresses. Ma Yang, Yang's sister, often assisted. On April 16, 2020, law enforcement searched two parcels that Perez III mailed to Sanchez, pursuant to sneak and peak warrants. The search revealed that each parcel contained $20,000 in U.S. currency hidden in magazines. The money was meticulously taped between the various magazine pages to conceal the parcels' true contents.

Although Perez III and/or Yang used aliases and unrelated addresses to ship the packages, post office video surveillance, court-ordered location data from tracking devices on their vehicles and telephones, and court-authorized intercepted communications confirmed their association with the packages.

Since at least December 11, 2019, Perez III and Yang mailed at least 87 packages, believed to contain bulk U.S. currency, to Sanchez in California, using the United States Postal Service (USPS). Based upon DTO records, the DTO mailed approximately $1.7 million in drug proceeds in a six-month period. In July 2020, Perez III mailed three USPS parcels containing a total of $60,000 to Sanchez. All three parcels were believed to be stolen, prompting the DTO to stop mailing drug proceeds, and instead use couriers to deliver bulk currency to Sanchez.

### Defendant – Louis Perez, III

Louis R. Perez III (a/k/a "Ocho," and "Eight Ball"), led a DTO that distributed cocaine and marijuana, obtained from California and Chicago, since at least January 2017, and continuing through September 2020. Perez III branded his product "Midwest Connect" or "Midwest Connected," and he designed and used packaging reflecting this branding to market his product. During the course of this investigation, Perez III used several cellular telephones, including (626) 733-xxxx and (213) 529-xxxx (Target Telephones 1), (414) 499-xxxx (Target Telephone 3), and Snapchat account "midwest_connect" (Target Account 1). Perez III primarily used Snapchat to distribute marijuana, vape cartridges, wax, and edibles. Perez III distributed drugs himself, and, using his Snapchat account, he also referred his "Midwest Connected" customers to various other DTO associates. Perez III has been identified as a Mexican Posse street gang member.

### _Eight Kilogram Seizure of Cocaine in Utah_

On September 25, 2018, Perez III, Xina Yang (Yang), and Perez Jr., Perez III's father, were driving from California to Wisconsin. Perez Jr. was driving a Ford F-150 truck, while Perez III and Yang drove a Chevrolet Suburban with California plates. At approximately 2:47 a.m., Perez Jr. was stopped by Utah Highway Patrol because his truck's registration plate did not return to the truck. While stopped, Perez III called Perez Jr., and Perez Jr. asked Perez III to wait for him at the next exit.

A canine trained in drug detection alerted on Perez Jr.'s truck, which Perez Jr. gave officers consent to search. A subsequent search of Perez Jr.'s truck revealed a hidden hydraulic compartment in the rear seat area, which contained eight packages of cocaine wrapped in plastic wrap, totaling eight kilograms.

Perez Jr. was arrested for Possession with Intent to Deliver Cocaine, and he subsequently provided conflicting information in a post-arrest _Mirandized_ interview. He stated that he had been in California, whereas previously he told arresting officers he had been in Las Vegas. Perez Jr. further stated that Perez III and Yang drove with him in the truck from Milwaukee to California, but Perez III and Yang rented a truck in California because they did not want to make the return trip to Milwaukee "inconvenient" for Perez Jr. Perez Jr. was released on bail after his interview. On September 25, 2018, Perez Jr., Perez III, and Yang departed Los Angeles, California, on the same American Airlines flight, which arrived at Chicago O'Hare airport in the early morning hours on September 26, 2018.

Hotel records reflect that on September 21, 2018, Yang rented two rooms at a Best Western in Indio, California, through September 25, 2018. Yang provided Perez Jr.'s address, and it appeared as though Perez III signed the rental agreements for both rooms. The room charges were paid for with cash and a credit card. Yang also booked all of the return flights on September 25, 2018, using her Wells Fargo Bank debit card, after she received a $2,000 deposit into her Wells Fargo bank account at a branch location in St. George, Utah.

Additionally, on September 21, 2018, Perez III and Perez Jr. activated two pre-paid phones, with which they used to communicate until Perez Jr. was stopped with the eight kilograms of cocaine. Perez Jr.'s prepaid phone was located in his truck, next to his "personal" phone. A review of the download of Perez Jr.'s prepaid phone identified the only listed contact as "L." When Perez Jr. was arrested, he stated that Perez III purchased the prepaid phone on September 21, 2018, using an unknown subscriber, and that he used it only for the GPS feature. Notably, the day after this traffic stop, Perez III cancelled a phone number that he had activated on July 26, 2017, and established a new number.

8

Perez III now admits that he and Yang possessed the eight kilograms of cocaine seized on September 25, 2018, in Utah, and concealed their possession of it through Perez Jr.

### *Receipt of Packages and Marijuana Vape Cartridge Manufacturing*

Intercepted communications over Target Telephones 1 and 4, as well as contemporaneous surveillance of DTO members, revealed that Perez III coordinated the shipment of packages containing controlled substances to various DTO associate residences in Milwaukee, Wisconsin, and also that Yang facilitated delivery of packages to Ma Yang and Mary Yang, Yang's sisters.

With respect to many of the packages containing controlled substances (1) Perez III and Yang routinely tracked many of these packages on their cell phones and expressed concern for some of the packages' whereabouts when they failed to arrive in the expected timeframe, which was reflected in intercepted communications; (2) Perez III and/or Yang coordinated the delivery and retrieval of the packages among the DTO members; (3) based on surveillance, the DTO used multiple members, vehicles, and counter surveillance techniques to retrieve packages from the various addresses in Milwaukee, Wisconsin; and (4) at least some of the packages were in the name of aliases.

After two packages, one from FedEx and one from UPS, were seized on April 29, 2020 (as described above), throughout April 29 and 30, 2020, both Perez III and Yang contacted FedEx and UPS numerous times, inquiring about the whereabouts of the packages that had been intercepted. On May 1, 2020, after learning about the interceptions of the two packages containing controlled substances, Perez III changed both of their phone numbers.

At the direction of Perez III and Xina Yang, the DTO manufactured and distributed "vape cartridges" containing THC oil in the Milwaukee area. Specifically, the DTO purchased the pen vaporizer parts individually, filled the cartridges with THC oil shipped from California, and put the cartridges in "West Coast Cure CUREpen" and "Rove" boxes. In 2019, the DTO manufactured the marijuana vape cartridges in California at Airbnb units Perez III and Xina Yang rented. Subsequently, the marijuana vape pen manufacturing lab was in the basement of Mary Yang's residence, located at 47xx N. 48th Street, Milwaukee, Wisconsin. Perez III and Xina Yang recruited DTO members, to include family members, established quotas for filling and packaging the vape cartridges, and paid the DTO members for meeting those quotas.

In early April 2020, DHL opened five packages that arrived at its facility from Hong Kong and that were destined for DTO addresses. Because the packages were sent internationally from Hong Kong, Customs and Border Patrol (CBP) opened the packages, revealing hundreds of "West Coast Cure CUREpen – 1000 mg

THC," "Rove Tangy Sativa," and "Rove Dream Hybrid," vape cartridge boxes, which included plastic inserts designed to hold vape cartridges that contain THC oil. Based upon case agents training, experience, and familiarity with the investigation, case agents believe the cartridges are commonly used to consume THC oil through "vaping."

During the investigation, case agents obtained a search warrant for Perez III's iCloud account. After reviewing the information received as a result of the search warrant, case agents found an email, dated October 19, 2019, from Perez III and Yang's previous landlord. The landlord expressed a concern regarding drug activity at 2x Rose Lane, Vallejo, California, a residence rented by Perez III and Yang. Attached to this email was a photograph depicting a "Shark 710" oil filling machine, which is a machine that is marketed to the Cannabis and CBD oil market and is priced between $13,000 and $15,000. The machine is fully automated and is capable of filling 100 cartridges in an average of 30 seconds.

### Search of Mary Yang's Residence

On September 19, 2020, City of Milwaukee Police Officers were dispatched to a shooting investigation at 47xx N. 48th Street, Milwaukee, Wisconsin. During the course of the investigation, officers observed bullet holes at the rear of 47xx N. 49th Street, Milwaukee, Wisconsin. After attempting to make contact with the occupants of the residence, and receiving no answer, the officers forced entry into the residence to ensure that the occupants had not been injured by the gunshots.

Upon entry, law enforcement officers observed a large marijuana vape manufacturing operation. The residence was then secured while law enforcement officers applied for and obtained a state search warrant for the residence.

In the master bedroom, which was secured by a padlock, authorities recovered identifiers for Mary Yang and her boyfriend, B.J. Authorities further recovered from the master bedroom closet multiple firearms, extended magazines and numerous rounds of live ammunition. Behind the master bedroom door, propped up against the wall, authorities recovered a Draco Romarm/Cugir firearm with 30 live rounds in the magazine. Law enforcement authorities also located a blue Igloo brand cooler on the master bedroom floor near the bed containing 700 grams of a substance that tested positive for the presence of opiates. Inside the master bedroom dresser drawer authorities also located a Glock Model 21 .45 caliber pistol, with a magazine containing 13 live rounds of ammunition.

A search of the spare bedroom revealed on box of Legend OG filled marijuana vape cartridges for a total THC weight of 3,191 grams. In a child's bedroom, authorities found a marijuana vape cartridge filling device with a power box containing THC oil residue. The filling device is often referred to as a "gun," and it used to inject the THC into the cartridges.

10

In the living room, authorities recovered filled marijuana vape cartridges with a total THC weight of 618 grams. Law enforcement authorities further recovered a 30 round magazine containing 28 live rounds of .45 caliber ammunition and one brand new 30 round 9mm magazine contained within a mail envelope, displaying a shipping address of "Mary Yang, 47xx N. 49th Street, Milwaukee, Wisconsin." Additionally, officers recovered a Smith and Wesson .38 Special Revolver, loaded with six live rounds on a tv tray in the living room.

A search of the basement revealed a complete marijuana vape assembly operation. Law enforcement authorities recovered the following: six plastic containers of suspected THC oils; lids from 74 boxes that originally contained 100 full marijuana vape cartridges (total of 7,400 full cartridges) with the initials of codefendants representing boxes they had filled; empty vape cartridge boxes; marijuana vape cartridge filling devices with power boxes all containing THC oil residue (i.e., guns to inject the THC into the cartridges); stickers used to identify the strain of THC; boxes containing 1,000 empty vape cartridges in boxes addressed to "Luis Perez" at 4xx E. Morgan Avenue, Milwaukee, Wisconsin; and, approximately 1,600 loose filled marijuana vape cartridges located throughout the basement containing THC oil. From a FedEx shipping box, law enforcement authorities also recovered 35 bottles containing THC oils with a total weight of 15,873 grams. Additionally, authorities recovered at least 86 beakers containing THC oil. These oils were found in various locations throughout the basement THC laboratory. In sum, authorities recovered 42,309 empty marijuana vape cartridge boxes; 31,100 empty vape pen cartridges; filled vape cartridges totaling 37 kilograms; and 33.5 kilograms of THC oils.

### Search of Ma Yang and Michael Bub's Residence

Additionally, on September 22, 2020, a federal search warrant was executed at Ma Yang and Bub's residence, 4xx E. Morgan Avenue, Milwaukee. In sum, law enforcement authorities located sixteen firearms, multiple boxes of unfired ammunition of varying calibers, firearm accessories and drug trafficking paraphernalia throughout the residence.

In the main floor hallway closet, law enforcement authorities, in part, recovered the following: two 600 gram digital scales; a rail light for a firearm; a plastic handgun holster, and nineteen rounds of unfired .45 automatic cartridges.

In the master bedroom used by Ma and Bub, authorities recovered a loaded handgun in a dresser. On the dresser authorities, in part, recovered: multiple boxes of unfired cartridges (i.e., Winchester 12 gauge universal shotshells, 9mm unfirmed cartridges, .22 caliber cartridges); two loaded .22 caliber 25 round capacity magazines; a plastic handgun holster; a Promag extended handgun magazine; and, a 5.56 x 45 Promag rifle magazine. Within the master bedroom authorities also

11

searched two black bags. Along one of the walls, law enforcement authorities searched a black bag that contained boxes of Winchester heavy load shotgun shells. In a second black bag located in the closet, authorities recovered a loaded Browning Arms 9mm pistol along with additional 9mm rounds and other ammunition of varying calibers. This bag also contained spent 9mm and .380 casings, respectively, in addition to three firearm cleaning kits. Also in the bedroom closet authorities recovered three ammunition boxes containing hundreds of rounds of ammunition of varying calibers along with 9mm spent casings. In a bedroom nightstand, authorities recovered a rolled dollar bill with cocaine residue.

The locked bedroom safe was also searched, and, in part, authorities recovered the following: a drum style pistol magazine; a MCK Micro, pistol conversion kit with Bushnell optic, Inforce light and folding stock; a loaded S&W Military 15-round capacity magazine; and varying calibers of ammunition contained in Exotic Edition vape boxes.

A safe located in the living room was searched as well. Contained within this safe authorities recovered a loaded Remington 870 Express Magnum 12 gauge shotgun, a Mossberg International 715T .22 caliber rifle; a Benelli Inertia Super Black Eagle II 12 gauge shotgun; a Norinco 7.62x39mm SKS rifle, and a Mossberg Model 535 12 gauge shotgun. Again, authorities also located ammunition of varying calibers in this safe.

In the kitchen, authorities recovered a baggie with marijuana and vials of liquids containing marijuana extract along with one box of Winchester .40 full metal jacket rounds (200 count). Another bedroom contained a Foodsaver brand vacuum sealer commonly used to package controlled substances.

In the bedroom closet of F.Y., the thirteen-year-old daughter of Ma, law enforcement found a black Adams Arms Huldra Mark IV 5.45x39 rifle with magazine, chambered and loaded, with 16 rounds of ammunition in the magazine.

### *DTO Stash Locations*

### **21xx W. Pierce Street, Apartment #201, Milwaukee, Wisconsin**

The Perez III DTO used 21xx W. Pierce Street, Apartment #201, Milwaukee, Wisconsin as a stash location. On April 10, 2020, case agents installed a remote camera at this residence.

In the early morning hours of April 12, 2020, case agents obtained six large black garbage bags from the dumpster in the parking lot associated with the Pierce Street stash apartment, four of which were determined to be associated with Apartment #201. An analysis of the remote camera footage by case agents revealed that numerous black garbage bags were removed from the apartment. Case agents

12

recovered a total of 498 "Shield N Seal" brand vacuum sealed bags some of which continued to maintain the odor of fresh marijuana. Based upon their training and experience, case agents know that the bags recovered from the garbage are commonly used to transport marijuana, and each individual bag, when full, holds approximately one pound of marijuana. Further, case agents observed that the inside of each bag was wet and appeared to have been rinsed out to remove any marijuana residue.

Furthermore, remote surveillance and positional cell phone data revealed that Perez III and Yang frequented the Pierce Street stash apartment. Remote surveillance and interceptions over Target Telephones 1, 3, and 4 further reflected that other DTO members had access to and/or were observed on multiple occasions at the Pierce Street stash apartment, to include Soto, Rodriguez, Gomez Jr., Jasmine Perez, Perez III, Yang, Reyes, Galan, Hauseng Yang, Perez JR. (prior to reporting to prison) and several other unidentified individuals. On various occasions, the DTO members, including Soto, Rodriguez, Gomez Jr., Perez III, and Reyes, along with other unidentified individuals, have been observed carrying both into and out of the stash apartment large boxes and bags.

On August 19, 2020, at approximately 1:50 p.m., Soto was arrested on an outstanding felony Violation of Parole warrant while exiting 21xx W. Pierce Street after it was learned that Soto was a suspect in a shooting investigation conducted by the Milwaukee Police Department. Soto attempted to flee in a vehicle and on foot, but he was taken into custody in the parking lot. A search of Soto's vehicle revealed a blue colored bag, which contained a loaded 9mm Glock pistol, with a 30-round extended magazine, and which was reported stolen out of Detroit, Michigan, and approximately 650 grams of marijuana and 12 marijuana vape cartridges.

Later in the afternoon of August 19, 2020, case agents observed Perez III, Antonio Rodriguez, Esteban Reyes, and Hector Arenas at Arenas' residence, 17xxx S. 6th Street, Milwaukee, Wisconsin. Based upon surveillance, it appeared that Perez III, Rodriguez, Reyes, and Arenas were moving numerous bags believed to contain controlled substances out of the stash house, and into various vehicles used by the DTO. At the same time, these three also appeared to be conducting numerous drug transactions.

The covert camera at 21xx W. Pierce Street, #201 reflected that the DTO cleaned out this stash apartment in anticipation of a search warrant being executed after Soto's arrest. More specifically, at approximately 12:26 a.m. on August 20, 2020, Reyes and Luis Gomez Jr. used a pry bar to gain access to apartment #201. Reyes and Gomez Jr. exited at 12:46 a.m. Reyes was observed exiting #201 with two black duffel bags, and Gomez Jr. was observed exiting pulling a red suitcase and carrying long objects covered possibly with a sheet or blanket. Based upon the shape of the objects, case agents believe these items to be some type of long guns. Gomez Jr. also carried out a garbage bag.

13

**1724C S. 6th Street, Milwaukee, Wisconsin**

Perez III also used Hector Arenas's house, 17xxx S. 6th Street, as an additional "stash" location for storing the DTO's controlled substances. Case agents observed Perez III bring boxes to Arenas's house. Case agents also observed Perez III walk in and out of Arenas's house with duffel bags before engaging in drug transactions. Case agents observed other DTO members at this residence. These members include Soto, Rodriguez, Gomez Jr., Perez III, Yang, Mary Yang, Ger Yang, and Reyes. During numerous hours of surveillance conducted at the residence, case agents observed many instances of drug trafficking activity, including but not limited to, packages and bags going in and out of the residence.

Additionally, on May 30, 2020, at 11:58 p.m., Arenas, using (414) 366-xxxx, called Perez III, using Target Telephone 1. During this call, Arenas advised Perez III that Arenas and his girlfriend had been involved in an argument and Arenas's girlfriend called the police. Arenas stated, "…she was calling the cops, [U/I] that I am a drug dealer and all types of shit bro." Later in the conversation Arenas stated, "She was beating my ass bro so if they come here bro and they c--, Imma wait outside. I'm not gonna let them come in or knock on my door." Based upon their training, experience, and familiarity with the investigation, case agents believe that Arenas informed Perez III that Arenas had been involved in a physical altercation with his girlfriend, and he was worried that she told the police Arenas was a drug dealer. Further, Arenas informed Perez III that Arenas was not going to let the police enter the residence and would wait outside for the police to arrest him.

In response Perez III stated, "No, lock everything in your house dawg, lock the doors. Then put everything-put the guns, put all the guns downstairs. Grab your keys man and hide 'em bro. Hide them somewhere outside dawg." Arenas asked, "Hide what outside?" Perez III replied, "Like lock your doors. Lock all your doors to your house and go outside, bro, and then just grab your keys and put 'em in the bucket outside bro." Based upon their training, experience, and familiarity with the investigation, case agents believe that Perez III told Arenas to lock up the stash house and hide all of the stored guns. Perez III also directed Arenas to hide the keys so that the police couldn't access the house. Arenas replied, "Alright. [U/I] guns right now dawg." Perez III replied, "Yeah, just put the all guns in the basement, bro." Case agents believe that at the direction of Perez III, Arenas hid all of the guns stored at the residence in the basement at 17xxxx S. 6th Street.

**11xx S. 26th Street, Milwaukee, Wisconsin**

In September 2020, case agents reviewed a recorded video jail call placed by Soto to Perez III on September 3, 2020, at 4:02 p.m., while Soto was in custody. The video call depicted Perez III driving to 11xx S. 26th Street. While inside the residence, Perez III stated, "There's gonna be plenty of spots bro. Plenty, like four or five spots you can choose from." Case agents know that Perez III is actively

14

purchasing various properties in the Milwaukee area. Soto declared, "I want that one." Perez III laughed and stated, "It's yours, primo." Perez III walked to the front door and opened it. Court ordered GPS data on Perez III's Chevrolet Impala and Rodriguez's Nissan Maxima also reflected the vehicle at this location on multiple dates in August and September 2020.

## 12xxx S. 25th Street, Milwaukee, Wisconsin

On July 2, 2020, at 4:44 p.m., Yang, using Target Telephone 4, called Chong Yang (Chong), Yang's relative, using (414) 639-xxxx. Yang asked, "Can you tell your landlord that he wants the upstairs?" Chong stated, "I can do that. Why?" Yang replied, "Cause he still wants the upstairs." Chong agreed, "Okay, I can do that." Case agents believe that Perez III wanted to rent the upper unit of Chong's residence at 1239 S. 25th Street to use as an additional stash location for the Perez III DTO.

On September 8, 2020, case agents conducted surveillance of Perez III, Antonio Rodriguez, and Hector Arenas. At approximately 5:18 p.m., Perez III, operating a white Hyundai, and Rodriguez, operating his Nissan Maxima, arrived at 17xxx S. 6th Street, the residence of Arenas, and entered the residence. At approximately 5:48 p.m., case agents observed Perez III, Rodriguez, and Arenas exit the west side entry door of 17xxx S. 6th Street. Each of the aforementioned men carried a large box with orange writing, which were loaded into Arenas's Explorer. During the course of the investigation, case agents have observed FedEx and/or UPS deliver similar boxes to the DTO. Arenas thereafter carried another box into his Explorer.

After extensive counter surveillance by Perez III, Rodriguez, and Arenas, all three parked at the rear of 12xx S. 25th Street. The Explorer (Arenas) backed into a parking spot at the rear of the residence. Further, court-ordered GPS data for Perez III's Impala, Arenas's Explorer, and Rodriguez's Nissan revealed all vehicles were in parked at this residence at various times and days in September 2020.

On September 22, 2020, Arenas was found and arrested at 12xxx S. 25th Street. Also located at this residence was approximately 2,650 filled THC vape cartridges, totaling approximately 4.6 kilograms of THC oil; approximately 800 empty vape cartridges; approximately 81.85 grams of cocaine; approximately 3,000 grams, or 5.2 kilograms, of THC wax; approximately 1,200 grams of flower THC; thousands of THC edibles, totaling approximately 111.1 kilograms; approximately 13 cell phones; a digital scale; and 1 loaded firearm, a FN Herstal, model FNP-45, 45 caliber pistol, in the bedroom closet. Approximately 2 grams of cocaine were also located in Arenas' White Ford Explorer on this day.

## 31xx Lloyd Street, Milwaukee, Wisconsin

On September 22, 2020, law enforcement officers conducted a search of 31xx Lloyd Street, Milwaukee, Wisconsin, the residence of Chong Yang. In the living room, authorities recovered numerous sheets of Sativa Hybrid Labels, displaying 84.88 grams of THC, the active ingredient in marijuana. Additionally, in the living room authorities located a box with numerous white plastic tubes containing suspected filled THC oil cartridges.

In the first-floor bedroom, authorities located a shoe box that contained 356 loaded marijuana vape cartridges. In the upstairs north bedroom, law enforcement authorities located empty marijuana vape pen boxes. In the upstairs south bedroom closet, authorities located ten boxes of edible THC gummies, a loaded Mosberg Model 500 pistol grip 12-gauge shotgun, a DPMS LR-30308 semi-automatic firearm loaded with a magazine and a round in the chamber, and two additional magazines for the rifles.

In the basement, in part, authorities recovered marijuana vape instructional manuals and packaging boxes; numerous boxes of THC gummies; over 1,000 empty marijuana vape cartridges, and packaging material for marijuana vape cartridges.

A total of approximately 333 kilograms of marijuana infused edibles and 9.9 kilograms of filled vape cartridges were located at Chong Yang's house.

### *DTO Distribution - Snapchat*

A search warrant was authorized and executed for Perez III's Snapchat account, "midwest_connect," Target Account 1. Perez III's account revealed numerous conversations regarding sales of marijuana and numerous chats indicative of marijuana and cocaine distribution. Perez III's account further revealed that he directed customers to other DTO distributors to purchase controlled substances.

For example, Perez III's Snapchat Story dated May 11, 2020, stated, "From now on every Sunday and Tuesday Shop will be closed but u can still get right with my brothers @hauseng3 @manuels4066 @midwest bump." As another example, Perez III's Snapchat Memory dated April 1, 2020, stated, "I'm all sold out so hit me up my brothers if u wana get good Midwest Connected shit #otw shit @hauseng3 @manuels4066." The investigation revealed that "hauseng3" was Hauseng Yang, "manuels4066" was Soto, and "midwest bump" was Rodriguez.

Perez III's Snapchat account contained hundreds of photographs and/or videos depicting processed marijuana, different marijuana strains, marijuana edibles, vape cartridges, marijuana wax, large marijuana grows, greenhouses, photographs of Perez III, large amounts of U.S. currency, photographs of receipts from shipping companies showing shipments to Milwaukee, lists of what was available and prices for "packs" (pounds) of marijuana broken down by strain and amount available for sale, photographs of "Midwest Connected" packaging bags, packaged one-pound quantities of marijuana inside of vacuum sealed bags, packaged THC "wax" in one-gram containers similar to what was intercepted by law enforcement on April 29, 2020, and two photographs of kilograms quantities of cocaine. A few examples are below.

 

We got everything u needs from grams to a 100 pack on 🍫....an personal carts to whole sale carts 🛒 "BEST PRICES IN MKE" #CALIPRICES

 

### *Perez III and Yang Sent Drug Proceeds to Sanchez via U.S. Mail*

DTO members, including, but not limited to Perez III, Yang, and Sanchez used the U.S. mail to send and/or receive drug proceeds collected in the Eastern District of Wisconsin and shipped to various locations in California.

United States postal records, post office video surveillance, and court ordered location data from tracking devices on vehicles used by Perez III and Yang reflect

17

that Perez III and Yang mailed at least 87 packages containing bulk U.S. currency to Julian Sanchez in California, between December 11, 2019, and July 2020, from the U.S. Post Office located at 5500 S. Howell Avenue, Milwaukee, Wisconsin.

Based upon United States postal records, out of the 87 suspected drug proceeds parcels, all but one were addressed to "Julian Sanchez." The packages were sent to addresses associated with Sanchez or mailbox rentals through third-party shipping companies. Generally, Perez III and Yang used aliases and addresses with no current ties to them to ship the packages.

Based upon their training, experience, and familiarity with the investigation, case agents believe that from the intercepted telephone calls and the investigation to date, each of the U.S. Postal packages contain $20,000 in drug proceeds. As set forth above, case agents have documented 87 packages sent by Perez III and/or Yang to Sanchez from approximately December 10, 2019, through July 28, 2020. Based upon this analysis, the Perez III DTO mailed approximately $1.7 million in drug proceeds to Sanchez in a six-month period.

### *Perez III and Yang Residence – 1653 S. 57th Street, Milwaukee, Wisconsin*

The Milwaukee County Register of Deeds revealed that on or about February 14, 2020, the real property identified as Parcel number 438-0671-000, and located at 1653 S. 57th Street, West Allis, Wisconsin, was purchased for $185,000 by "Jasmine L. Perez" and "Violeta L. Gonzalez," Perez III's and Jasmine Perez's mother. In fact, one month after the purchase, on March 31, 2020, Perez III called Jasmine and reminded her to make the mortgage payment. (Hey, for the mortgage, um, you gonna make the payment?). Additionally, Perez III purchased a large safe and hired contractors to cement it into the floor of the basement of 16xx S. 57th Street, as reflected in intercepted communications.

Despite the above, Perez III and Yang had access to and control over the residence, are the true owners of the property, and concealed their true ownership of the residence.

On September 22, 2020, law enforcement authorities searched 16xx S. 57th Street, Milwaukee, Wisconsin, pursuant to a federal search warrant. Upon arrival, authorities located nine individuals in the residence, to include five co-defendants: Perez III, Xina Yang, Jasmine Perez, Esteban Reyes, and Hauseng Yang.

In the front living room closet, law enforcement authorities located a money counter and a semi-automatic Glock pistol. Four cell phones were seized from the first floor living room.

18

In the dining room, authorities located a digital scale, a .40 caliber Glock model 22 Gen4, .40 caliber pistol, which was loaded and chambered, and a flip cellular telephone.

In the kitchen, authorities located 2 rifle magazines on the top of a cabinet, kilogram wrappings in black electrical tape, a vacuum seal bag in a kitchen drawer, a Ruger 9mm magazine with five 9mm rounds, a Springfield model Hellcat 9mm semi-automatic handgun, and a cellular telephone.

In the first floor bedrooms, authorities located a digital scale, approximately 1-1.5 ounces of cocaine, a bag of suspected marijuana located in a children's shoe, 8 non-labeled prescription pill bottles containing assorted pills, and 3 cellular telephones. Two additional cell phones were located in the first floor hallway.

In Perez III and Yang's bedroom, authorities located five firearms, to include the following:

- a semi-automatic Glock handgun, with extended magazine and a round in the chamber, located in baby bassinet in Yang and Perez III's bedroom;
- a semi-automatic Glock, 9mm, with a chamber in the round, and five rounds in magazine, and an additional empty Glock 9 mm magazine located in purse on top of dresser;
- a semi-automatic rifle, Crusader Model ST15, loaded with 29 .223 rounds and a round in the chamber located under Yang and Perez III's bed;
- a semi-automatic Sterling handgun, .22 caliber, loaded with 5 rounds on the bed; and
- a semi-automatic Ruger handgun, 9mm, also on the bed.

Also located in Perez III and Yang's bedroom was approximately $135,453.59 from multiple locations to include behind the bed, in the purse with the handgun, on top of the dresser, and in a dresser; an extended 9 mm magazine loaded with 21 rounds of 9mm ammunition; identification for Perez III and Yang; and approximately 16 cellular telephones.

### *Perez III and Yang Concealed Drug Proceeds through Bank Accounts*

A review of bank information revealed that Perez III and/or Xina Yang opened at least 9 different bank accounts between January 2017 and April 2020. Perez III and/or Yang deposited over $175,000 in cash into these accounts during this time frame. Further, the currency deposited into these accounts preceded significant expenditures or cash withdrawals, and that the deposits and withdrawals occurred both in California and Milwaukee. Additionally, the deposit and withdrawal activity often corresponded with flight activity of various Perez III DTO members.

## *Sources of Information*

Sources of information (SOI) provided details regarding Perez III and Xina Yang's drug trafficking activities that corroborated information developed during the course of the investigation. Additionally, SOI's provided information about specific facets of Perez III and Xina Yang's distribution of heroin, cocaine, and marijuana and the attendant cash proceeds.

SOI #1 stated that SOI #1 met PEREZ III in approximately the fall of 2017 or early 2018. SOI #1 stated SOI #1 supplied Perez III with approximately 10 kilograms of cocaine per week over a time period of 1.5 to two years when Perez III was in Milwaukee, and one kilogram of heroin around February or March of 2019. According to SOI #1, Perez III mainly sold kilogram quantities of cocaine and large amounts of marijuana. SOI #1 stated that Perez III paid approximately $30,000 for a kilogram of cocaine and approximately $46,000 for a kilogram of heroin, and Perez III always paid SOI #1 in cash.

SOI #1 stated that Perez III brought approximately 800-1,000 pounds of high-grade marijuana to Milwaukee from California each month for distribution in the Milwaukee area. Perez III also sold "vape pens" containing THC in the Milwaukee area. Perez III told SOI #1 that Perez III made more money selling marijuana than cocaine or heroin.

SOI #1 described SOI #1 as the "back up supplier." SOI #1 stated that Perez III had an additional kilogram level cocaine source of supply in California and Milwaukee. Perez III told SOI #1 that even though the kilograms of cocaine cost a little more in Milwaukee than they do in California, it was sometimes easier and less risky for Perez III to obtain the cocaine in Milwaukee.

SOI #3 related that SOI #3 began purchasing ½ to 1-ounce quantities of cocaine from Perez III, also known to SOI #3 as "Ocho," and "Lulu," around the beginning of 2018. Perez III charged SOI #3 $1,000 per ounce of cocaine. SOI #3 purchased cocaine from Perez III for one month, until Perez III went to California. At that time, Perez III sent Antonio Rodriguez to deliver cocaine to SOI #3, who purchased 1-2 ounces of cocaine one or two times each month. This continued until approximately mid to late 2018 or early 2019, when SOI #3 did not speak with Perez III for approximately four months because SOI #3 did not have Perez III's current phone number. Then, in mid-2019, SOI #3 began purchasing 1-2 ounces of cocaine again, as well as ¼ pound quantities of marijuana. SOI #3 further related that Perez III told SOI #3 that heroin sales generated a lot of money and inquired whether SOI #3 wanted to sell heroin. SOI #3 declined.

In August 2019, Perez III approached SOI #3 about renting a room at 17xxx S. 6th Street, Milwaukee, Wisconsin, in which Perez III could "keep stuff." SOI #3 understood this to include controlled substances. SOI #3 related that the rent

20

totaled $600, and that SOI #3 paid $300 and Perez III paid $300. SOI #3 stated Perez III had his own room in the unit, had keys to the unit, and came and went when he pleased. Perez III often brought other DTO associates to assist in DTO activity.

At 17xxx S. 6th Street, SOI #3 observed Perez III unpacking boxes containing multiple pounds of marijuana and 5-6 "slabs" of marijuana wax. SOI #3 further observed Perez III wearing a respirator mask while using the "Magic Bullet" blender to mix heroin. On one occasion, SOI #3 observed a substance suspected to be heroin in a gallon size paint can that was ¼ full. SOI #3 asked Perez III to move the heroin out of the 6th Street house, which Perez III did. Later, Perez III confirmed to SOI #3 that the substance was heroin, and at this time, also showed approximately 2 ounces of heroin in chunk form, stating that he (Perez III) "pressed" it. SOI #3 knew Perez III kept a press under the sink at 17xxx S. 6th Street, which Perez III took with him when he removed the heroin from the residence.

SOI #3 related that SOI #3 stored guns for Perez III at 17xxx S. 6th Street. The firearm in which SOI #3 was arrested in possession of was given to SOI #3 by Perez III. Additionally, SOI #3 related that Perez III stored two pistols and/or revolvers, as well as two AR style rifles (one with a scope), at the S. 6th Street residence.

SOI #3 indicated that SOI #3 went to Chicago two times with Perez III to obtain kilograms quantities of cocaine. The first time was in early winter 2019, at which time Perez III rented a vehicle. The two drove to Chicago together, checked in to a Holiday Inn Hotel, and met a supplier in the hotel parking lot. Perez III wanted to see the cocaine, which was brought to the room. SOI #3 confirmed the quality was good, at which time Perez III gave the supplier approximately $60,000 for two kilograms of cocaine. SOI #3 drove the kilograms of cocaine back to Milwaukee alone, while Perez III took an Uber back. Perez III paid SOI #3 $500 for this trip. Perez III and Rodriguez sold the cocaine in five days, with SOI #3 selling approximately 4.5 grams.

SOI #3 drove for Perez III a second time to obtain cocaine, around mid-September 2020. SOI #3 drove in a separate vehicle behind Perez III and Reyes, who were driving a rental van. Once in Gary, Indiana, they made random stops to check for a law enforcement "tail." Seeing none, they drove to an alley, where Perez III got out of the van with an MCM brand bag with U.S. currency. Perez III then entered a garage and exited shortly after carrying a blanket containing three kilograms of cocaine, which Perez III placed in the trunk of SOI #3's car. SOI #3 drove the cocaine back to Milwaukee, with Perez III and Reyes driving separately. SOI #3 stated that although SOI #3 requested $1,000 as payment for driving, Perez III never paid him. SOI #3 further related that Perez III charged $50,000 per

21

kilogram of cocaine, but Perez III told SOI #3 that he did not want to sell kilogram quantities due to the cocaine shortage during the summer of 2020.

According to SOI #3, Perez III asked SOI #3 to travel to San Juan, Puerto Rico, in the summer of 2020, to inspect and obtain cocaine. Before leaving, Xina Yang and Perez III provided SOI #3 with $60,000. SOI #3 carried $10,000 to $12,000 in a carry-on luggage. Yang packed the remaining cash into SOI #3's suitcase. Perez III and Yang paid for SOI #3's trip expenses. SOI #3 obtained a new phone while in Puerto Rico, and Perez III instructed SOI #3 to download the Wickr telephone application so that Perez III and SOI #3 could keep in contact during this time. SOI #3 stayed in Puerto Rico for 10 days. However, the transaction did not ultimately occur.

In August 2020, SOI #3 also flew to California to bring drug proceeds to Julian Sanchez. Before leaving for California, SOI #3 brought a suitcase to Perez III and Yang's house, at which point Yang packed money in it. Perez III also gave $10,000 to SOI #3 to put in a carry-on bag. For this trip, SOI #3 was paid $400, although SOI #3 was supposed to be paid $800.

SOI #3 provided information related to two incidents in which Perez III and other DTO associates arrived to 17xxx S. 6th Street after shootings occurred during the summer of 2020. The first time, Perez III arrived to SOI #3's residence and told SOI #3 that he had been involved in a shooting. Rodriguez, Hauseng Yang, and Esteban Reyes were with Perez, and SOI #3 observed these three "wiping" down Rodriguez's Nissan. According to SOI #3, Perez III stated that he and the three others shot at a "snitch," that all four fired shots, that Perez III "had hit him," and that Perez III was not sure if any kids were in the car. SOI #3 related that Perez III took off his black sweater and asked SOI #3 to dispose of it. Everyone except Reyes left their guns at SOI #3's residence, but the guns were removed the next day.

The second shooting in which SOI #3 related knowledge of was one in which Perez III told SOI #3 who the target was, and that the target was a "snitch." According to SOI #3, Perez III, Rodriguez, Soto, and Reyes were in a vehicle when Perez III saw the target on the street, shot at him, and believed he hit him. SOI #3 stated Perez III came to SOI #3's residence armed with a pistol, and that Perez III wanted to store the pistol at the residence. SOI #3 refused to store the pistol for Perez III.

SOI #4 stated that in approximately June or July of 2018, either Xina Yang or Perez III contacted SOI #4 about driving marijuana from California to Milwaukee for them. SOI #4, Xina Yang, and Perez III all drove to California in a rented vehicle. After staying for about a week, Perez III and Yang loaded about three to four suitcases or larger moving boxes into the rented vehicle, and they drove to Milwaukee. Upon arrival in Milwaukee, Perez III unloaded the boxes at

4xx E. Morgan Avenue, Perez Jr.'s residence. SOI #4 stated that SOI #4 was paid approximately $3,000 for this trip.

Around July 2019, SOI #4 made another trip to California. Once in California at Yang and Perez III's residence, Perez III, Yang, and SOI #4 loaded the rental van with empty marijuana vape supplies. Perez III and Yang directed SOI #4 to take the marijuana vape supplies to Jasmine Perez where they met at codefendant Chong Yang's residence. SOI #4 then returned the rental van to California where Perez III loaded up SOI #4's vehicle with moving boxes containing marijuana.

On August 28, 2019, SOI #4 was stopped in Wyoming while driving a large amount of U.S. currency for Yang and Perez III to California. During this stop, authorities recovered a possession quantity of marijuana. Law enforcement authorities seized approximately $100,000 during this stop. After her release from jail, Yang told SOI #4 that there was more money concealed within the van. The van was released back to SOI #4, and SOI #4, among others, drove to Perez III and Yang's residence in California, where SOI #4 followed Yang's instructions to remove the additional cash.

In October 2019, SOI #4 made another trip to California, this time traveling from Milwaukee to California with cash. Prior to departure, SOI #4 had a Facetime call with Yang, who directed SOI #4 on how to pack the money in the suitcase. Upon arrival in California, SOI #4 went to an Airbnb that Perez III and Xina Yang had rented. At the Airbnb, other codefendants were present who were filling marijuana vape cartridges with marijuana oils. SOI #4 stayed until there were 6,500 filled marijuana vape cartridges, which SOI #4 and codefendant Ger Yang drove back to Milwaukee, Wisconsin, in a rental vehicle. Yang and/or Perez III paid SOI #4 $6,500 for this trip.

After staying in Milwaukee for two or three days, SOI #4 drove the rental van back to California where other codefendants were filling marijuana vape cartridges. Perez III and Yang paid marijuana vape cartridge fillers $40 per 100 vape cartridges. SOI #4 drove 10,000 finished vape cartridges back to Milwaukee, and Yang and/or Perez III paid SOI #4 $10,000 for making this trip on behalf of the DTO.

SOI #4 related that SOI #4 made three additional trips to California for Perez III and Yang to transport drug proceeds and/or marijuana.

In April or May of 2020, Yang asked SOI #4 whether SOI #4 wanted to make extra money. Yang told SOI #4 that Yang and Perez III would pay $6,000 to rent SOI #4's basement to make marijuana vape cartridges. SOI #4 agreed. Perez III stocked the basement with the necessary supplies to manufacture the marijuana vape cartridges, including the marijuana oils. Yang and Perez III recruited Yang's

23

family as employees to fill the marijuana vape cartridges including, but not limited to: SOI #4, Ma Yang, Azia Yang, Hauseng Yang, Ger Yang, Michael Bub, Chong Yang, and Carina Rodriguez. Perez III and Yang were responsible for mixing the oils to attain the right consistency. SOI #4 knew that both filled and unfilled marijuana cartridges were stored in SOI #4's basement and that Perez III and Yang would take them out, as needed, to sell. Yang and Perez III paid the family members, with Yang maintaining a ledger for payment. The ledger was kept in SOI #4's basement marijuana vape manufacturing site.

During the search of SOI #4's residence in September 2020, authorities recovered 700 grams of heroin. SOI #4 stated the heroin belonged to Yang and Perez III.

SOI #5 related that SOI #5 met Perez III, who SOI #5 also knew as "Ocho," around August 2018, in Venice, California. At this time, Perez III and Yang had approximately $300,000 to purchase 8-10 kilograms of cocaine. Their normal cocaine supplier was not available right away, so SOI #5 attempted to assist them in purchasing cocaine. Perez III ultimately said that SOI #5's source's prices of $25,000-$27,000 per kilogram were too high and decided to wait for his normal supplier.

Approximately one month later, in September 2018, SOI #5 related that SOI #5 flew to Milwaukee with $4,500 to obtain cocaine from Perez III. Perez III picked SOI #5 up upon arrival and blindfolded him. Perez III took SOI #5 to Perez III's house on S. 25th Street and W. Pierce Street. When they arrived, Perez III took off the blindfold, and SOI #5 saw a floor full of various guns and ammunition. Perez III bragged that he "ran Milwaukee," and he carried a rifle into the basement to obtain 2 kilograms cocaine. According to SOI #5, Perez III made him try the cocaine to prove SOI #5 was not cooperating with law enforcement. Eventually, SOI #5 obtained approximately 4 ounces of cocaine from Perez III.

Shortly thereafter, SOI #5 was with Perez III in a silver Dodge Charger when Perez III conducted numerous cocaine transactions, including selling an ounce of cocaine to two separate customers and 9 ounces to a third customer. SOI #5 related that Perez III told SOI #5 that he was selling approximately 10 kilograms of cocaine each week and sometimes more than 40 kilograms each month in Milwaukee. In 2018, SOI #5 also helped Perez III mix heroin with an unknown cutting agent at a stash house in Milwaukee, which produced approximately 2 ounces of heroin.

SOI #5 related that when Louis Perez Jr. got stopped with 8 kilograms of cocaine in a trap compartment in September 2018, Perez III, Perez Jr., and Yang met with the supplier of the 8 kilograms.

Around the fall of 2018, SOI #5 and Perez III met at Moe's steakhouse in Milwaukee to discuss SOI #5 supplying Perez III with large quantities of

24

marijuana. Subsequently, Yang purchased airline tickets for SOI #5 and Perez III to fly from Milwaukee, to Los Angeles, California. Once in California, SOI #5 contacted a marijuana broker, Perez III rented a vehicle, and Perez III purchased edible marijuana and some "Packwoods." SOI #5 and Perez III also drove to Eureka, California, where Perez III purchased 40 pounds of marijuana from a different grower. SOI #5 learned at this time that Xina Yang's mother, who worked as a marijuana trimmer, knew numerous people with large marijuana grow farms in Northern California, and that Perez III and Yang obtained large quantities of marijuana for cheaper prices through Yang's connections. While in California, Perez III received a text message from Yang with the address of a marijuana grower in Shasta, California. The next day, SOI #5 went with Perez III to purchase 50 pounds of marijuana.

Perez III told SOI #5 that if Perez III and Yang could not obtain enough marijuana from the Asian growers, then Perez III would go through SOI #5. Perez III agreed to pay SOI #5 $50 a pound to obtain, package, and ship the marijuana to Perez III from California to Milwaukee. During this time, SOI #5 was sending Perez III approximately 500 filled marijuana vape cartridges each month, various other marijuana products, and 80 to 100 pounds of marijuana, which continued until approximately the fall of 2019.

In fall of 2019, SOI #5 indicated that Perez III and Yang were evicted from their home on Rose Lane in California, and SOI #5 helped them pack their belongings. At this time, Perez III gave SOI #5 two handguns to hold for Perez III, which handguns were seized during the search of SOI #5's residence on September 22, 2020. In November 2019, Perez III purchased equipment to manufacture marijuana vape cartridges. According to SOI #5, SOI #5 and Perez III split the cost of a $26,000 marijuana vape cartridge filling machine. Perez III and Yang initially manufactured the cartridges themselves, but eventually recruited family members to perform the manufacturing.

Towards the end of 2019, SOI #5 was with Perez III and Yang when Perez III and Yang were looking at kilogram quantities of cocaine. SOI #5 recalled that Perez III and Yang had their young child with them while inspecting the cocaine at a mobile home in Coachella. Believing the cocaine was of poor quality, Perez III and Yang did not purchase any at this time.

SOI #5 stated that most of the marijuana supplied to the DTO was from "B," who SOI #5 met through Perez III. According to SOI #5, Perez III and "B" talked on WhatsApp and Wicker telephone applications. SOI #5 also stated that SOI #5 connected Perez III with Miguel Sarabia to assist in providing material for manufacturing marijuana vape cartridges. Although SOI #5 stated that Perez III agreed to pay SOI #5 $20 for every $100 made through this connection, SOI #5 never received any cut of these proceeds.

25

SOI #5 stated that SOI #5 always carried a debt with Perez III. The debt ended up being approximately $200,000. Perez III instructed SOI #5 where to send the marijuana and to whom the boxes should be addressed, and if any of the boxes went missing, SOI #5 would be financially responsible to Perez III for the loss. Perez III attempted to hold SOI #5 responsible for the drug proceeds that were sent to California and went missing, but ultimately, SOI #5 and Perez III split the loss. Perez III shipped a Chevrolet Tahoe to SOI #5 in California so that SOI #5 could transport more marijuana than SOI #5's Prius could handle. The $36,000 SOI #5 owed to Perez III was expected to be paid in pounds of marijuana.

SOI #5 stated that SOI #5 communicated with Perez III mainly through the Wickr telephone application, but also through WhatsApp, Snapchat, Signal, and FaceTime.

After SOI #5 and Perez III were arrested in this case, SOI #5 stated that Perez III told SOI #5 that he purchased 5 kilograms of cocaine a few days before their arrest, and that Perez III had heroin and some guns stored at Mary Yang's residence.

SOI #6 related that SOI #6 became aware that Perez III, also known to SOI #6 at "Ocho," "8 Ball," and "Lulu," sold marijuana in 2016. After meeting Xina Yang around June of 2017, he began selling much larger quantities of marijuana. Around December 2018, Perez III asked SOI #6 where he could send packages. SOI #6 provided a list of addresses. SOI #6 was paid $50 for each package sent to those addresses.

Around January of 2019 and continuing until approximately October 2019, SOI #6 began operating the Milwaukee-end of the DTO while Perez III and Yang were in California. SOI #6 collected packages from the various Milwaukee addresses, and Perez III and Yang tracked the packages and told SOI #6 when to retrieve them. Perez III instructed SOI #6 to open the boxes and keep track of the pounds of marijuana. At this time, approximately 2-4 packages were sent each week, and each box contained 11-13 pounds of marijuana and marijuana-related products. SOI #6 also collected the DTO's drug proceeds, which Sanchez flew to Milwaukee to pick up on occasion for Perez III and Yang.

Around June 2019, SOI #6 rented 21xx W. Pierce Street, apartment 201, in Milwaukee, for Perez III and Yang, who planned to use it as a stash location for the DTO. SOI #6 was given discounts on marijuana prices for renting the stash apartment. SOI #6 related that Perez III "cut out" SOI #6 from the DTO in the fall of 2019.

SOI #6 further related that SOI #6 middled a deal for ½ ounce of heroin between a customer and Perez III around November or December 2019.

26

When Louis Perez, Jr. was stopped and arrested in possession of 8 kilograms of cocaine, SOI #6 received a call from a bail bondman who wanted $6,000 for Perez Jr.'s bail. Perez III instructed SOI #6 to call Rodriguez for the money and subsequently paid Perez Jr.'s bail. According to SOI #6, Perez III believed he, Yang, and Perez, Jr. were "set up."

SOI #6 stated that Perez III, Soto, and Rodriguez all used the "Midwest Connect" Snapchat account. SOI #6 further stated that Perez III talked more openly on the Wickr application, believing it was safer.

According to SOI #6, Perez III and Yang were involved in the purchase of 16xx S. 57th Street in Milwaukee, and that Perez III paid at least $20,000 in cash to remodel the residence after moving in. SOI #6 further stated that Perez III had numerous guns.

SOI #7 related that Perez III, also known to SOI #7 as "Ocho," "Lu Lu," and "8 Ball," began selling kilogram quantities of cocaine around the age of 16 and had a few suppliers at this time. In 2018, SOI #7 sold 4 ounces of cocaine for Perez every couple of weeks for a few months. Perez III "fronted" the cocaine to SOI #7, and SOI #7 paid Perez III $1,000 per ounce of cocaine. Around 2017 and 2018, Perez III and Yang were purchasing 5 to 10 kilograms of cocaine from separate suppliers, and they paid cash for the kilograms. By 2018, SOI #7 related that Perez III began transporting the kilograms of cocaine to Milwaukee. With respect to Perez Jr.'s traffic stop with 8 kilograms of cocaine, SOI #7 stated that Perez III purchased the truck for $15,000 so that he could transport cocaine.

In May 2019, SOI #7 was riding with Perez III and observed Perez III sell ½ kilogram of cocaine and 9 ounces of cocaine to separate customers. According to SOI #7, SOI #7 knew from Perez III that the cocaine was shipped by the cartel to Chicago. The Perez III DTO had numerous cocaine suppliers – and those that would know them all would be Perez III, Xina Yang, and Rodriguez. SOI #7 observed kilograms of cocaine in the basement of Perez III and Yang's residence on S. 25th Street.

SOI #7 further related in the summer of 2020, Perez III and Yang were actively seeking cocaine due to the shortage and shifted much of the DTO's efforts into marijuana trafficking. Perez III was worried that cocaine was not getting across the United States border due to COVID lockdowns. Shortly before Perez III's arrest, he told SOI #7 he was going to obtain kilogram quantities of cocaine.

SOI #7 relayed information pertaining to heroin as well. Specifically, in 2018, SOI #7 was present at Perez III and Yang's residence on S. 25th Street and saw a kilogram of heroin in the basement. SOI #7 stated that Perez III said the heroin had fentanyl in it and that Perez III "had to step on it a bunch of times," and Perez III was compressing the cut heroin into a kilogram. Also in 2018, SOI #7 was riding in

27

a Dodge Charger with Perez III and Yang when Perez III gave 6 ounces of heroin to a customer. Perez III was driving at the time. The customer gave Perez III a 3-4 inch stack of cash, which Perez III then gave to Yang. In August 2020, SOI #7 saw Perez III and Rodriguez mixing 1 kilogram of heroin and pressing it into a kilogram shape using a press.

SOI #7 relayed information pertaining to marijuana as well. According to SOI #7, in 2018, Perez III and Yang were supplied by Asian marijuana growers known to Yang's family, as well as Mexican cartel growers known to Perez III. SOI #7 further stated that the Asian marijuana growers spoke Hmong, and Yang translated for Perez III on at least one occasion when SOI #7 was with Perez III and Yang to obtain pounds of marijuana from the growers. SOI #7 accompanied Perez III to various marijuana farms to obtain hundreds of pounds of marijuana, to include 300 pounds on one occasion.

When Perez III and Yang lived in California, they rented an Airbnb by Anaheim to fill marijuana vape cartridges. Perez III and Yang mixed the marijuana oils to obtain the desired consistency, paid each person assisting up to $1,000 per day depending on how many cartridges were filled, and paid financial bonuses to those who filled more than their quota. SOI #7 assisted in manufacturing in California, and the DTO manufactured approximately 60,000 vape cartridges that were subsequently shipped to Milwaukee. SOI #7 related that the DTO made at least 80,000 vape cartridges between August of 2019 and September of 2020.

Perez III fronted marijuana to SOI #7 to sell, and SOI #7 sold the marijuana using the Snapchat application and the "Midwest Connect" account. SOI #7 helped unpack the boxes of marijuana once shipped to Milwaukee at the stash house on S. 6th Street or the one at 21xx Pierce Street. Each box, which was glued shut and contained sticky tiles, contained anywhere from 10-16 pounds of marijuana. SOI #7 stated that SOI #7 observed Perez III and Yang sell between 300 and 500 pounds of marijuana each month, and when SOI #7 was in California, SOI #7 observed Perez III and Yang purchase approximately 500 pounds of marijuana each month, which was sent to Milwaukee for distribution.

According to SOI #7, SOI #7 maintained a stash apartment at 21xx W. Pierce Street, where the DTO stored marijuana and guns. According to SOI #7, there were approximately 6 guns in the apartment in August 2020, and they all belonged to Perez III. The guns included a "Crusader," a shotgun with a pistol grip, one "M16," a .38 revolver, and possibly another shotgun. Perez III also stored guns at his residence on 57th Street and 4xx Morgan Street, Perez Jr.'s residence.

SOI #7 stated that SOI #7 and Perez III attempted to bring structure back to the Mexican Posse's (MP), as several of the younger members had not been "jumped in," and they hoped the structure to the MP's would get younger members more organized.

28

SOI #8 related that in 2013, at 17 years old, Perez III showed SOI #8 a kilogram of cocaine. Sometime in 2019 or 2020, SOI #8 stated that Perez III fronted SOI #8 300 marijuana vape cartridges, totaling $3,900. Subsequently, while at the stash house on 17xxx S. 6th Street, Perez III fronted SOI #8 1 pound of marijuana for $3,200 and 50 marijuana cartridges for $650. Perez III also gave SOI #8 sixteen 1-ounce "Midwest Connect" bags to use for re-packaging the marijuana for distribution. On another occasion, SOI #8 purchased 1 ounce of cocaine for $1,450 and 10 grams of heroin for $350 from Perez III.

SOI #8 further related that Perez III loaned SOI #8 a .45 caliber Llama 1911. Perez III later asked for the firearm back and instead provided SOI #8 with a blue steel .38 Smith & Wesson. Perez III told SOI #8 to "keep it for protection." SOI #8 saw Perez III with a gun on 3 occasions, to include twice at 21xx W. Pierce Street and once at a cookout at Perez Jr.'s residence. SOI #8 further stated that Xina Yang always carried guns for Perez III in her purse, and that SOI #8 saw Yang remove a .40 or .45 caliber black Glock pistol with an extended magazine and give it to Perez III at Perez Jr.'s residence. SOI #8 stated that Perez III told SOI #8 that SOI #8 had enough firearms "to start a war."

SOI #9 related that SOI #9 received packages containing controlled substances between approximately the beginning of 2018, and September 2020. SOI #9 was paid $200-$250 per package, and at the height of the DTO, SOI #9 received approximately 2 packages every week. SOI #9 further related that Perez III or Yang would either text of call to inform SOI #9 when a package would arrive.

SOI #10 stated that SOI #10 lived at 36xx W. Burnham Street, and shortly before SOI #10's arrest, at 4xx Morgan Street. SOI #10 stated that in early 2019, Yang began sending "important packages" to the residence and asked SOI #10 to retrieve them. SOI #10 was paid $100 per package – mostly by Yang, but sometimes by Perez III. After receiving about four to five packages, SOI #10 was aware that the packages contained marijuana.

SOI #10 kept two safes in a spare bedroom at the residence. SOI #10 was aware that Yang and Perez III kept money in one or both of these safes. SOI #10 never saw money in the safes, but know that money was stored in them because Yang told SOI #10 that she and Perez III were storing money in them. SOI #10 observed Perez III and codefendant Antonio Rodriguez come over to the residence with backpacks, go into the room with the safes, and then leave a short time later. Yang and Perez III came over almost every day, and Antonio Rodriguez was over a lot. Because Yang visited the residence frequently, Yang had a key to the house.

During COVID-19 in 2020, Yang asked SOI #10 to help package money for Yang and Perez III. SOI #10 was paid $100 for her packaging work, and SOI #10

packaged money on two or three different occasions. Yang directed the process, and Perez III was in and out of the room where they were packaging the money.

As another employment opportunity, Yang and Perez III asked SOI #10 and Michael Bub if they wanted to make money assembling marijuana vape cartridges. SOI #10 agreed, as did other family members, and SOI #10 was paid by Yang and Perez III to manufacture marijuana vape cartridges. SOI #10 filled and packaged a large number of marijuana vape cartridges.

Around July 2020, SOI #10 moved into 4xx Morgan Street where Perez Jr. lived prior to reporting to prison. SOI #10 arranged with Perez III and Yang that the packages containing marijuana and marijuana vape suppliers were to be sent to Burnham and not Morgan. However, after moving into Morgan about 200 to 300 large packages were shipped to Morgan. SOI #10 was unhappy about this, and Perez III gave SOI #10 $500 for the trouble.

SOI #10 was aware that Yang and Perez III supplied codefendant Michael Bub with cocaine in 2018 until COVID-19 arrived. SOI #10 was aware that Perez III charged Michael Bub about $1,000 an ounce. SOI #10 was aware of about two to three transactions between Bub and Perez III, but there may have been more. On most occasions Yang delivered the cocaine to Bub. Bub would also make payment to Yang for the purchased cocaine. At times, Bub would pick up the cocaine directly from Perez III.

While residing at Morgan, the day after codefendant Manuel Soto was arrested, Perez III brought guns to Morgan that had been at Soto's residence at the loft stash apartment. Perez III went downstairs to the basement right away and when he came back up, he told SOI #10 that he had dropped off the guns from Soto's loft apartment. SOI #10 further stated that the guns located in the safe at Morgan belonged to Perez III. Perez III almost always had a gun with him when he came to Morgan.

After Mary Yang's house was searched, Yang and Perez III told SOI #10 to take everything from the residence on Morgan to codefendant Chong Yang's old house on S. 25th Street. Perez III and Yang met SOI #10 at this location, and a number of codefendants unloaded the boxes. After all the boxes were located at the S. 25th Street residence, SOI #10 met Perez III and Yang at a residence on S. 26th street that had been previously unknown to SOI #10. Perez III and Yang told Mary Yang and her family that they could stay at that location until Perez III and Xina determined what had transpired and who had "snitched."

SOI #11 also provided information about the Perez III DTO. Around July of 2019, Yang asked SOI #11 if SOI #11 wanted to make extra money by going to California to assist Yang and Perez III with manufacturing marijuana vape cartridges. SOI #11 agreed, and while traveling to California with Mary Yang law

30

enforcement officers stopped Mary Yang's vehicle where about $100,000 in cash was concealed. Mary Yang later told SOI #11 that Mary had been transporting the cash for Perez III and Yang. SOI #11 stayed in California approximately two months manufacturing marijuana vape cartridges under the direction of Yang and Perez III. Over these two months, SOI #11 made approximately $4,000 to $6,000.

During the summer of 2020, Yang again approached SOI #11 about manufacturing marijuana vape cartridges in Milwaukee. SOI #11 agreed and began manufacturing marijuana vape cartridges in Mary Yang's basement after Perez III and Yang set up the lab and mixed the marijuana oils.

SOI #11 further stated that SOI #10 observed Perez III with a firearm at the Morgan Street address.

SOI # 16 also worked for Yang and Perez III manufacturing marijuana vape cartridges. Before beginning this work, and while in the basement at Mary Yang's house, Yang and Perez III asked SOI #16 if SOI #16 wanted to become involved to which SOI # 16 answered affirmatively.

Both SOI # 11 and SOI # 16 traveled to California together with drug proceeds. Yang packed the suitcase for the both of them prior to traveling. Additionally, prior to traveling Yang gave both SOI #11 and SOI #16 $9,000 each to carry on the plane. Once in California, they gave the cash, possibly totaling $50,000, to Sanchez. On another occasion, Yang and Perez III recruited SOI #11 to travel to California with cash for Sanchez to purchase more marijuana.

Additionally, SOI #12 related that Perez III recruited SOI #12 to receive packages at 1xx W. Crawford Avenue, Milwaukee, Wisconsin. SOI #12 has known Perez III since childhood, and starting in the summer of 2017, Perez III asked SOI #12 if SOI #12 wanted to accept packages of "candy" in exchange for payment. Perez III initially paid SOI #12 $150 per package. At this time, SOI #12 received approximately two to four packages a month. Shortly thereafter, SOI #12 put it together that Perez III was shipping marijuana and marijuana related products, not "candy," to SOI #12's address after viewing Perez III's Snapchat account where Perez III was selling marijuana and marijuana related products.

Shortly before October 2018, SOI #12 stopped receiving packages, but resumed in the spring of 2019. At this time, Perez III agreed to pay SOI #12 $350 per package. At this time, Perez III was now consistently shipping about two packages a week to the address. Once the packages arrived at Crawford, SOI #12 contacted Perez III through Snapchat and let Perez III know the package arrived. Generally, someone connected to the DTO would pick up the packages.

SOI #12 was aware that Perez III also sold cocaine, and on two occasions paid SOI #12 for receiving packages with cocaine. SOI #12 was also aware that other

31

DTO members were selling cocaine for Perez III. Around 2018, SOI #12 visited Perez III at the house where Perez III was residing at the time. At this time, two unknown individuals arrived at the residence. SOI #12 observed about seven to eight kilograms of cocaine on a kitchen table after the unknown visitors departed the residence.

On December 2, 2021, Perez III made or caused to be made a discovery related posting regarding the instant case to the public portion of his Facebook account. Specifically, Perez III publicly posted or caused to be posted information regarding disseminated discovery specifically covered by the Protective Order issued in this case. Perez III further stated that he would reveal the bulk of the information synopsized in the post after sentencing. On December 10, 2021, United States Magistrate Judge Nancy Joseph found that Perez III violated the Protective Order and revoked the defendant's communication privileges to ensure the safety of others and compliance with the Protective Order.

Based upon the evidence, Perez III is responsible for the distribution of at least 3,000 kilograms but less than 10,000 kilograms of a mixture and substance containing marijuana, a Schedule I controlled substance, at least 150 kilograms but less than 450 kilograms of a mixture and substance containing cocaine, a Schedule II controlled substance, and at least 3 kilograms but less than 10 kilograms of a mixture and substance containing heroin, a Schedule I controlled substance. Furthermore, Perez III now admits that on or about September 22, 2020, Perez III possessed firearms, described in Count Six of the Indictment, in furtherance of his drug trafficking.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

6. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment, fines, and supervised release:

COUNT ONE: 10 years to life and $10,000,000 fine. The Count also carries a mandatory minimum of 10 years of imprisonment, and at least 5 years and a maximum life term of supervised release.

COUNT SIX: a mandatory minimum of 5 years and a maximum life term of imprisonment, consecutive to any other count, $250,000 fine, and a maximum of 5 years of supervised release.

Each count also carries a mandatory special assessment of $100.

7.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney, including any possibility that the defendant may qualify as a career offender under the sentencing guidelines.

## DISMISSAL OF REMAINING COUNTS

8.     The government agrees to move to dismiss the remaining counts of the indictment as to Louis R. Perez, III at the time of sentencing.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

9.     The parties understand and agree that for the penalties in 21 U.S.C. §841(b)(1)(A) to apply, as provided in paragraph 6 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty involved at least 1,000 kilograms of marijuana, and at least 5 kilograms of cocaine, a Schedule II controlled substance. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## ELEMENTS

10.     The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute or to distribute a controlled substance as set forth in Count One, in violation of 21 U.S.C. §§ 841(a)(1) and 846, the government must prove each of the following propositions beyond a reasonable doubt:

33

<u>First</u>, the conspiracy, as alleged in the indictment, existed; and

<u>Second</u>, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy

11.     The parties understand and agree that in order to sustain the charge of possessing a firearm during and in relation to a drug trafficking crime as set forth in Count Six, in violation of 18 U.S.C. § 924(c), the government must prove each of the following propositions beyond a reasonable doubt:

<u>First</u>, that the defendant committed the crime of conspiracy to distribute and possess with intent to distribute controlled substances;

<u>Second</u>, that the defendant knowingly possessed a firearm; and

<u>Third</u>, that the defendant's possession of the firearm was in furtherance of the conspiracy.

## **<u>SENTENCING PROVISIONS</u>**

12.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

13.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

14.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses

34

set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

15. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

16. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

17. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant

conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

18.     The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 3,000 kilograms but less than 10,000 kilograms of a mixture and substance containing marijuana, a Schedule I controlled substance, at least 150 kilograms but less than 450 kilograms of a mixture and substance containing cocaine, a Schedule II controlled substance, and at least 3 kilograms but less than 10 kilograms of a mixture and substance containing heroin, a Schedule I controlled substance.

## Base Offense Level

19.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 36 under Sentencing Guidelines Manual § 2D1.1(c)(2), based upon a converted drug weight.

## Role in the Offense

20.     Pursuant to Sentencing Guidelines Manual § 3B1.1, the parties agree to recommend to the sentencing court that a 4-level increase be given for an aggravating role in the offense, as the defendant was an organizer or leader.

## Obstruction

21.     Pursuant to Sentencing Guidelines Manual § 3C1.1, the parties acknowledge and understand that the government will recommend to the sentencing court that a two-level increase be given for obstruction of justice.

36

## Acceptance of Responsibility

22.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

23.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

24.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

25.     The government agrees to recommend a sentence no higher than 22 years of imprisonment. The defendant agrees to recommend a sentence no lower than 18 years of imprisonment.

## Court's Determinations at Sentencing

26.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by

37

this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

27.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

28.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

38

29.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

## Special Assessment

30.     The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

## Forfeiture

31.     The defendant agrees that all properties listed in the Indictment and/or Bill of Particulars constitute the proceeds of the offense to which he is pleading guilty or were used to facilitate such offense. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

32.     The defendant agrees to take all steps as requested by the United States, including executing documents needed to pass clear title to forfeitable assets to the United States and to facilitate the sale of such forfeitable assets.  If any third party makes a claim as to any of these items, the defendant agrees to provide truthful testimony, if called up to do so, regarding his ownership of the item and regarding the validity of any claim of ownership by a third party.

39

33.     The defendant waives the requirements of Federal Rules of Criminal

Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging

instrument, announcement of the forfeiture at sentencing, and incorporation of the

forfeiture in the judgment.  The defendant acknowledges that the forfeiture of

assets is part of the sentence that the sentencing court may impose in this case and

the defendant waives any failure by the sentencing court to advise him of this,

under Rule 11(b)(1), at the time his guilty plea is accepted or at sentencing.

34.     The defendant further agrees to waive all constitutional and statutory

challenges in any manner (including by direct appeal, habeas corpus, or any other

means) to any forfeiture carried out in accordance with this plea agreement,

including any argument that the forfeiture constitutes an excessive fine or

punishment.

## DEFENDANT'S WAIVER OF RIGHTS

35.     In entering this agreement, the defendant acknowledges and

understands that he surrenders any claims he may have raised in any pretrial

motion, as well as certain rights which include the following:

    a.      If the defendant persisted in a plea of not guilty to the charges
            against him, he would be entitled to a speedy and public trial by a
            court or jury. The defendant has a right to a jury trial. However, in
            order that the trial be conducted by the judge sitting without a jury,
            the defendant, the government and the judge all must agree that
            the trial be conducted by the judge without a jury.

    b.      If the trial is a jury trial, the jury would be composed of twelve
            citizens selected at random. The defendant and his attorney would
            have a say in who the jurors would be by removing prospective
            jurors for cause where actual bias or other disqualification is
            shown, or without cause by exercising peremptory challenges. The
            jury would have to agree unanimously before it could return a

40

verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.   If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.   At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.   At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

36.   The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

37.   The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold

41

public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

38.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

39.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

40.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

41.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

42

42.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

43.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

44.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed

43

with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

45.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 12/20/21

LOUIS REY PEREZ, III
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 12/20/21

PATRICK K. CAFFERTY
Attorney for Defendant

For the United States of America:

Date: 12/21/2021

RICHARD G. FROHLING
United States Attorney

Date: 12/21/2021

ELIZABETH M. MONFILS
GAIL J. HOFFMAN
Assistant United States Attorneys

45